UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ADAM B.,[1]<br><br>                 Plaintiff,<br><br>v.<br><br>ANDREW M. SAUL, Commissioner of Social Security,<br><br>                 Defendant. | No. 19 CV 925<br><br>Magistrate Judge Young B. Kim<br><br>April 6, 2020 |

**MEMORANDUM OPINION and ORDER**

Adam B. ("Adam") seeks disability insurance benefits ("DIB") based on his claim that he is disabled by abdominal hernia, osteoarthritis, degenerative disc disease, depression, anxiety disorder, and substance addiction disorder. Before the court are the parties' cross motions for summary judgment. For the following reasons, Adam's motion is denied, and the government's is granted:

**Procedural History**

Adam filed his DIB application in May 2015 alleging a disability onset date of May 18, 2015. (Administrative Record ("A.R.") 13, 264-65.) After his application was denied initially and upon reconsideration, (id. at 102-12, 114-27, 134-38), Adam requested and was granted a hearing before an administrative law judge ("ALJ"), (id. at 139-41, 153-57, 181-85). Adam appeared for the hearing in August 2017 along with his attorney and a vocational expert ("VE"). (Id. at 42-101.) The ALJ issued a decision

---

[1] Pursuant to Internal Operating Procedure 22, the court uses only the first name and last initial of Plaintiff in this opinion to protect his privacy to the extent possible.

in December 2017 finding that Adam is not disabled. (Id. at 13-25.) When the Appeals Council declined Adam's request for review, (id. at 1-6), the ALJ's decision became the final decision of the Commissioner, *see Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015). Adam filed this lawsuit seeking judicial review of the Commissioner's decision, and the parties consented to this court's jurisdiction, *see* 28 U.S.C. § 636(c); (R. 6).

## Facts

Adam completed high school and three years of college and has worked as a mechanic, building engineer, and security officer. (A.R. 111, 311, 511.) He last worked in May 2015 as a building engineer. (Id. at 511.) He has undergone surgery on his right shoulder, abdomen for hernias, and right knee. (Id. at 294, 450-53, 511, 517, 541.) He said he quit his job because he became unable to sustain competitive work as of May 2015. He asserted that he was depressed and in "constant" pain in his right shoulder, neck, right knee, abdomen, back, and right groin. (Id. at 353, 356, 360, 398, 511, 513, 743, 785.)

### A.  Medical Evidence

The medical records Adam submitted to the ALJ show that he has received treatment for physical and mental impairments. (A.R. 517, 520, 541, 738.) Adam has had several hernia repairs. (Id. at 451-53, 513, 517, 541.) He underwent a right inguinal hernia repair in 2012. (Id. at 739.) In February 2015 Adam complained of abdominal discomfort and inguinal bulging. (Id. at 477.) His provider ordered a CT scan of his abdomen and pelvis, which showed a small bowel loop, "[s]trandy

2

densities" in his tissue, and a small left inguinal hernia. (Id. at 479-80.) In June 2015 Adam underwent surgery to repair his left and right inguinal hernias. (Id. at 451-53, 838, 840.)

Adam has pain in his right shoulder resulting from a labral tear and "[s]prains and strains." (Id. at 541, 547.) A December 2006 bone scan revealed osteoarthritic changes of the right shoulder. (Id. at 649; see also id. at 650 (November 2006 MRI of right shoulder demonstrating mild AC arthropathy and degenerative joint disease).) He underwent surgery on his right shoulder in 2007 but still experiences pain radiating from his neck, between his shoulder blades, and down his right arm. (Id. at 543, 545, 550, 585, 647, 651, 724, 729.) An October 2015 MRI of his shoulder showed "[m]ild" supraspinatus and intra-articular biceps tendinopathy, an anterosuperior and posterior superior labral tear, and a "[w]idened acromioclavicular joint." (Id. at 553-54, 703-04, 827-28.) An x-ray taken a few months later showed "impingement" of the right shoulder with "no metastatic lesions or invasive marrow changes." (Id. at 829.) Physical therapy was recommended, but Adam declined because of a recent hernia repair. (Id. at 584, 787.)

Adam suffers from neck pain. A September 2015 cervical spine x-ray showed "mild retrolisthesis of C2 over C3 with probable facet arthropathy" but no spondylolisthesis or fractures and otherwise normal alignment of the cervical vertebra. (Id. at 550, 694; see also id. at 798.) An MRI of the cervical spine, taken in December 2015, revealed "[d]iffuse cervical spondylosis" and "[u]ncovertebral osteophytosis result[ing] in bilateral foraminal narrowing at C3-C4, C5-C6, and

3

especially C6-C7." (Id. at 555-56, 590-91, 620, 706-07, 796-97.) On examination in March 2016, Adam showed decreased range of motion for cervical flexion. (Id. at 785-87.) X-rays of the cervical spine showed degenerative disc disease and spondylosis with kyphosis. (Id. at 786.) His physician recommended physical therapy. (Id. at 787.)

Adam also experiences back pain in the lumbosacral region. (Id. at 600-02, 606.) A May 2016 MRI of the lumbar spine was deemed "entirely unremarkable" and showed the following: minimal disc bulges at L2-L3; mild disc bulges at L3-L4, L4-L5, and L5-S1 with an annual fissure; mild central canal stenosis at L3-L4; and mild bilateral foraminal stenosis at L4-L5. (Id. at 608-09, 659-60, 757-59, 791, 802-03.) In September 2016 Adam visited his treating orthopedic surgeon and reported neck pain at a level of 7 out of 10 and back pain at an 8 or 9 out of 10. (Id. at 736.) He denied weakness, numbness, tingling, or radiating pain. (Id.) On examination his physician found that he had decreased range of motion for cervical flexion but otherwise normal results. (Id. at 737.) Imaging of the cervical and lumbosacral spine showed disc degeneration but no instability. (Id.) "[C]ore exercise stretching [and] strengthening" was recommended. (Id.)

Adam continued to complain of back and right leg and knee pain in 2017. (Id. at 668, 729.) An April 2017 electromyogram ("EMG") revealed "electrodiagnostic evidence" consistent with a right S1 radiculopathy but no "lower extremity mononeuropathy, polyneuropathy, or myopathy." (Id. at 652, 726-27, 767.) An ultrasound of the kidneys ruled out renal issues. (Id. at 760-61.)

4

Adam had arthroscopic surgery on his right knee in 2008 because of torn meniscus. (Id. at 517, 547, 552, 739; see also id. at 658 (2008 MRI of right knee showing a "[s]mall effusion and mild osteoarthritic changes").) He reported tightening and pain in his knee, along with difficulty driving and walking more than a half-block. (Id.) An MRI of his right knee from October 2015 showed that the "body/posterior horn of the lateral meniscus [was] slightly blunted," suggesting "a tiny radial tear." (Id. at 551-52, 701-02, 825-26.) Also, there was "mild edema within the quadriceps fat-pad," "[s]hallow partial-thickness cartilage loss," and a small Baker's cyst. (Id.) The medial meniscus, anterior and posterior cruciate ligaments, and tendons in the right knee were intact. (Id). Treatment notes interpreted the scan as showing "loss of articular cartilage with arthritis." (Id. at 584.) Adam received injections for his right knee pain. (Id. at 547, 584, 809, 811-13.) He underwent another right knee arthroscopy in April 2016. (Id. at 749-51, 818, 822-24.) Following the surgery, Adam "was instructed in a home exercise program." (Id. at 818-19.)

Turning to the evidence of his mental-health issues, Adam has been diagnosed with "major depressive disorder recurrent without psychotic features—moderate in severity." (Id. at 513; see also id. at 520, 547, 635.) He was diagnosed with symptoms of a major depressive episode as early as 2001 and admitted for psychiatric care in early 2002. (Id. at 513, 623-24.) He experienced another depressive episode in 2011 and was hospitalized for a week. (Id. at 475.) During an August 2015 psychiatric evaluation, he reported feeling "extremely depressed," socially isolated, sad, helpless,

hopeless, and worthless. (Id. at 510.) He also experienced "mild psychomotor retardation." (Id. at 513.)

In November 2015 Adam reported feeling "depressed" and "very overwhelmed." (Id. at 530-31; see also id. at 672, 709.) His primary complaint was difficulty sleeping. (Id. at 530; see also id. at 547, 698.) An examination showed that he was "mildly depressed" and had an anxious and constricted affect. (Id. at 530; see also id. at 666, 668, 670, 672 (noting a "long [history] of anxiety"), 847-49.) Adam continued to display an anxious mood and constricted affect on examination in September 2016, although he showed no signs of psychosis or cognitive deficits and his focus and concentration were good. (Id. at 670.) He has been prescribed antidepressant medications, including Lexapro, Paxil, and Zoloft, (id. at 460-62, 513, 530-31, 623, 626, 771-72, 846), and anxiety medications, including Ativan, Xanax, and Klonopin, (id. at 460-62, 511, 541, 543, 627, 667, 846).

Adam also has a "history of chronic alcohol dependence and abuse." (Id. at 510; see also id. at 469, 473, 489, 520.) He began drinking at age 15 and has a history of "blackouts, tremors, and seizures." (Id. at 510.) In February 2014 he reported drinking about 32 ounces of Vodka every day. (Id. at 473.) At that time, he was admitted for psychiatric treatment. (Id. at 473-74, 476.) He also participated in an intensive outpatient alcohol rehabilitation program. (Id. at 475, 510.)

**B. Hearing Testimony**

Adam testified that he stopped working as a building engineer in 2015 because of his knee and shoulder pain and depression. (A.R. 51, 66.) In terms of physical

impairments, he said he injured his right shoulder in 2007 and still experiences pain down through his back and in his knee. (Id. at 67-68.) His knee hurts when he drives or walks. (Id. at 68.) He also has trouble sleeping. (Id.)

As for mental impairments, Adam said his depression is "much better" but he still has "good days and bad days." (Id. at 74.) He takes medication to help with his depression and anxiety and has experienced "major improvement," although he still sees his doctor every two to three months and follows up when he has episodes. (Id. at 75, 82-83.) Adam also suffers from hyperactive thinking, up to three to four times a week for four to five hours at a time. (Id. at 82-83.)

As to physical limitations, Adam testified that his shoulder affects his ability to use his right arm, especially with side-to-side or upward movements. (Id. at 70.) He can stand for about five to ten minutes and can lift 10 pounds. (Id. at 70-71.) He said that he has issues with memory and ability to focus, (id. at 85-86), and cannot pay bills or manage money, (id. at 81). At times he has difficulty interacting with his family members. (Id. at 81, 84-85.)

For daily activities Adam testified that he wakes up, showers, sits outside, and then turns on the TV. (Id. at 72.) He eats frozen foods and sometimes does chores such as vacuuming and making his bed. (Id.) He did travel to Poland in 2015 when his mother-in-law passed away. (Id. at 73.)

## C. The ALJ's Decision

The ALJ followed the required five-step process in evaluating Adam's disability claims. *See* 20 C.F.R. § 404.1520(a). At step one the ALJ found that Adam had not

engaged in substantial gainful activity since May 2015. (A.R. 16.) At step two the ALJ concluded that Adam has the severe impairments of osteoarthritis, degenerative disc disease, depression, anxiety disorder, and substance addiction disorder. (Id.) At step three the ALJ determined that Adam's impairments do not meet or medically equal any listed impairment. (Id. at 16-17.) Before turning to step four, the ALJ assessed Adam as having a residual functional capacity ("RFC") to perform light work with the following limitations: he can push and pull as much as he can lift and carry; he can frequently reach and handle bilaterally, climb ramps and stairs, and kneel, crouch, and crawl; he can occasionally climb ladders, ropes, and scaffolds and interact with supervisors and coworkers but not with the public. (Id. at 17.) At step four the ALJ found that Adam is unable to perform his past relevant work, but at step five the ALJ determined that he can perform other jobs that exist in significant numbers in the national economy. (Id. at 23-24.)

## Analysis

Adam asserts that the ALJ erred by: (1) assigning "significant weight" to the state agency physician's opinion and then relying on that opinion when crafting the RFC; (2) giving too much weight to his treating physician's opinion; and (3) incorrectly evaluating Adam's symptoms. (R. 12, Pl.'s Mem. at 7-15.) This court reviews the ALJ's decision to ensure that it is supported by substantial evidence, meaning "more than a mere scintilla" but no more than "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotations and citations omitted). To adequately support

a decision, the ALJ must "build a logical bridge from the evidence to his conclusion" that the claimant is not disabled. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). The court's role is neither to reweigh the evidence nor to substitute its judgment for the ALJ's. *See Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). That said, if the ALJ committed an error of law or "based the decision on serious factual mistakes or omissions," reversal is required. *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014).

**A.     State Agency Physician**

Adam asserts that the ALJ erred by assigning "significant weight" to the opinion of the state agency physician, Dr. Bernard Stevens, and then by relying on that opinion when crafting Adam's RFC. (R. 12, Pl.'s Mem. at 7-12.) Adam contends that the ALJ's reliance on Dr. Stevens's opinion was improper because the physician did not review 450 pages of the medical record. (Id. at 8.) Adam points to "significant new evidence," including an April 2017 EMG revealing lumbar radiculopathy and records relating to a 2016 knee surgery, and argues that the evidence would have caused Dr. Stevens to reconsider his opinion. (Id. (citing A.R. 652, 750, 768, 822-24).) The government responds that the ALJ's RFC for Adam is more restrictive than that of Adam's own treating physician, a consultative examiner, and two other state-agency reviewing physicians. (R. 21, Govt.'s Resp. at 4.) In any event, the government argues that the ALJ considered and reviewed the record as a whole, accounting for all credible limitations, and supported her RFC analysis with substantial evidence. (Id. at 4-9.)

9

Dr. Stevens reviewed Adam's medical records at the reconsideration level and found that Adam could perform light work with postural limitations. (A.R. 122-24.) Specifically, Adam could perform the following: lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit for more than six hours in an eight-hour workday; occasionally climb ladders, ropes, and scaffolds; and frequently kneel, crouch, crawl, and climb ramps and stairs. (Id.) Dr. Stevens noted that these limitations resulted from Adam's cervical pain caused by degenerative disc disease and right rotator cuff tendonitis. (Id. at 122-23.)

The ALJ afforded significant weight to Dr. Stevens's opinion, finding that he "conducted a comprehensive records review," "formulated [his] conclusions based upon [his] expertise," and adopted opinions that were "consistent with the evidence of record." (Id. at 21.) But based on her review "of the record as a whole," including testimony and evidence received at the hearing level, the ALJ determined that additional exertional and manipulative limitations were warranted. (Id.) She incorporated those additional limitations into her RFC analysis. (Id. at 15, 17, 21.)

The ALJ provided substantial evidence to support her evaluation of Dr. Stevens's opinion and her RFC assessment. (Id. at 21.) She explained that Dr. Stevens was a state-agency consultant who formulated his opinions based on his expertise in disability evaluations, and that his opinions were consistent with the record evidence. (Id.) An ALJ may rely on a reviewing physician's assessment "unless later evidence containing new, significant medical diagnoses changed the picture so much that it reasonably could have changed the reviewing physician's

10

opinion." *Massaglia v. Saul*, ___ Fed. Appx. ___, 2020 WL 1062689, at *3 (7th Cir. March 4, 2020) (citation and quotations omitted). Here the evidence disclosed at the hearing level does not satisfy this standard.

To be sure, there has been no showing that the later evidence was "so significant that it was potentially decisive." *Id.* The ALJ conducted a detailed review of the evidence of record, including evidence submitted after Dr. Stevens's January 2016 record review. (See A.R. 18-20.) She noted that Adam underwent arthroscopic surgery on his right knee in 2016. (Id. at 19.) Afterward he participated in physical therapy, and his providers reported that "he was doing well after surgery." (Id.)

The ALJ also noted that Adam complained of neck and lumbar back pain in September 2016 but denied symptoms of radiating pain. (Id. at 20.) His treating orthopedist examined him and ordered diagnostic imaging, finding age-consistent cervical and lumbar disc degeneration without any evidence of instability. (Id.) The physician declined to support Adam's disability claim and ordered stretching and strengthening instead. (Id. at 20-21.) Then in April 2017 an EMG showed electrodiagnostic evidence "most consistent with a right S1 radiculopathy but no evidence of a lower extremity mononeuropathy, polyneuropathy, or myopathy." (Id.) Adam reported that he was not interested in physical therapy, and "providers treated his symptoms conservatively with medication management, electrical stimulation, heat, and home exercises," according to the ALJ. (Id.)

This new evidence does not change the picture so much as to discredit Dr. Stevens's opinion. His opinion was consistent with the other medical opinion

11

evidence—and none offered functional limitations as restrictive as the ALJ's RFC analysis. (R. 21, Govt.'s Mem. at 4.) Regardless, the ALJ expressly stated that she reviewed and considered the evidence submitted at the hearing level and accounted for additional limitations in her RFC assessment based on that evidence. (A.R. 21.) Ultimately, it is the ALJ's—not a physician's—duty to craft an RFC. *See* 20 C.F.R. § 404.1546(b). "An ALJ adequately supports [her] RFC determination when [she] consider[s] all limitations supported by [the] record evidence and tie[s] the record evidence to the limitations including in the RFC finding." *Vang v. Saul*, ___ Fed. Appx. ___, 2020 WL 865397, at *3 (7th Cir. Feb. 21, 2020) (citation and quotations omitted). Here the ALJ did just that. The court finds no error in the ALJ's evaluation of Dr. Stevens's opinion or in her RFC determination.

**B.    Treating Physician**

Adam argues that the ALJ accorded too much weight to his treating orthopedic surgeon Dr. Richard Lim's opinion. (R. 12, Pl.'s Mem. at 12-13.) An ALJ must decide how much weight to accord to a treating physician's opinion.[2] *See Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). An ALJ's evaluation of medical opinion evidence will be upheld if it is supported by substantial evidence, *Biestek*, 139 S. Ct. at 1154, meaning that the ALJ must "articulate[] 'good reasons'" for her decision. *Gibbons v. Saul*, ___ Fed. Appx. ___, 2020 WL 376499, at *4 (7th Cir. Jan. 23, 2020).

---

[2] On January 18, 2017, new regulations issued, eliminating the treating physician rule. *See* 20 C.F.R. § 404.1520(c). The new rules apply only to claims filed after March 27, 2017. Adam filed his DIB application on May 18, 2015. (A.R. 13.) Thus, the prior rules in 20 C.F.R. § 404.1527 govern this matter.

12

In September 2016 Adam visited Dr. Lim to discuss his claim for disability benefits. (A.R. 736-38.) Adam reported neck pain at a level of 7 out of 10 and back pain at an 8 or 9 out of 10 but denied weakness, numbness, tingling, or radiating pain. (Id. at 736.) Dr. Lim examined Adam's lymphatic system, cervical spine, and lumbar spine and found that he had decreased range of motion for cervical flexion but otherwise normal results. (Id. at 737.) Dr. Lim noted that Adam showed: no motor deficits; 5 out of 5 strength; intact sensation; normal reflexes, gait, and station; normal alignment in the cervical and lumbar spine; and normal range of motion in the lumbar spine. (Id.) He ordered imaging of the cervical and lumbosacral spine, which showed disc degeneration but no instability. (Id.) Based on this evidence, Dr. Lim concluded that Adam has "age consistent cervical and lumbar disc degeneration" but not "severe cervical stenosis or radiculopathy." (Id. at 738.) He declined to support Adam's claim for disability and instead recommended "core exercise stretching [and] strengthening." (Id.)

The ALJ afforded "partial weight" to Dr. Lim's statements indicating that he could not support Adam's disability claim. (Id. at 21.) The ALJ explained that Dr. Lim's opinion was consistent with the record but not supported by an explanation. (Id.) Adam argues that the ALJ erred by affording even partial weight to Dr. Lim's September 2016 opinion given that, according to him, it conflicts with the April 2017 EMG revealing radiculopathy. (R. 12, Pl.'s Mem. at 12 (citing id. at 652, 768).) Adam contends that, "[a]t a minimum, the ALJ should have contacted Dr. Lim to update his opinion." (Id.)

13

Here the ALJ provided a good reason for assigning Dr. Lim's opinion partial weight—his assessment was consistent with the record evidence. (A.R. 21.) Adam claims that the ALJ's "perfunctory" explanation lacks substantial evidence to support her finding. (R. 22, Pl.'s Reply at 5.) But the ALJ cited Dr. Lim's treatment notes for support. (A.R. 21 (citing id. Ex. 23).) *See also* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion."). Those notes show that Dr. Lim conducted a thorough examination in September 2016 based on Adam's complaints and ordered x-rays of his cervical and lumbar spine. (A.R. 736-38.) The examination and imaging revealed that Adam suffered from "age consistent cervical and lumbar disc degeneration." (Id. at 738; see also id. at 743-44 (May 2016 treatment note from Dr. Lim stating that an examination of Adam's lumbar spine showed "definite improvement with no new problems or positive findings" and that an MRI of the lumbar spine was "entirely unremarkable").) As a result, Dr. Lim declined to support Adam's claim for disability and ordered a strengthening and stretching regimen. (Id. at 738.) Given that Dr. Lim provided relevant evidence to support his opinion, the ALJ was entitled to give appropriate weight to his findings.

The ALJ also cited other evidence of record in her decision that was consistent with Dr. Lim's findings. *See* 20 C.F.R. § 404.1527(c) ("[T]he more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").) For example, the ALJ cited a "generally unremarkable" physical examination in

August 2015, despite a diagnosis of degenerative arthritis. (A.R. 18.) September 2015 records indicate that Adam complained of shoulder and neck pain, but he had good range of motion. (Id. at 19.) Physical therapy was recommended at that time and again in December 2015 and early 2016. (Id.) Although an April 2017 EMG showed "electrodiagnostic evidence most consistent with a right S1 radiculopathy," there was no evidence of "lower extremity mononeuropathy, polyneuropathy, or myopathy." (Id. at 20.) Adam declined physical therapy, and his providers treated him conservatively with Lyrica samples and other medication, electrical stimulation, heat, and home exercises. (Id.)

The ALJ also cited medical opinion evidence from the consultative examiner and state agency medical consultant indicating that Adam was not disabled. (Id. at 21.) The ALJ assigned only "partial weight" to consultative examiner Dr. Fauzia Rana's opinion that Adam did not have "any limitations of movement." (Id.; see also id. at 520.) The ALJ explained that she did so because the opinion was "generally consistent with the evidence of record, including Dr. Rana's own examination," but that he "did not support [his] conclusions with any explanation or rationale." (Id. at 21.) The record as a whole thus supports the ALJ's decision to afford partial weight to Dr. Lim's opinion and she adequately explained her decision.

Adam asserts that the ALJ should have contacted Dr. Lim to question him after the 2017 EMG revealed evidence of radiculapathy. (R. 12, Pl.'s Mem. at 12-13.) But an ALJ need not contact a physician for an explanation of apparent inconsistencies where "the record contain[s] adequate information for the ALJ to

15

render a decision." *Britt v. Berryhill*, 889 F.3d 422, 427 (7th Cir. 2018). Indeed, in his reply Adam acknowledges that "there is not an automatic requirement obligating the ALJ to seek an updated opinion given the mere existence of additional records." (R. 22, Pl.'s Reply at 2.) Dr. Lim's examination—and its consistency with the record evidence as a whole—provided a sufficient explanation for his findings. The ALJ did not need to resolve every potential inconsistency with other evidence, particularly given that she afforded Dr. Lim's opinion only partial weight. *See Hinds v. Saul*, ___ Fed. Appx. ___, 2020 WL 110257, at *2 (7th Cir. Jan. 9, 2020) (finding that an ALJ may discount a treating physician's opinion that conflicts with record evidence). Accordingly, the ALJ adequately supported her treatment of Dr. Lim's opinion.

**C.  Symptom Evaluation**

Adam argues that the ALJ erred by discounting his allegations of pain and other symptoms that were not grounded in the medical record or opinion evidence. (R. 12, Pl.'s Mem. at 13-15.) The government responds that the ALJ appropriately considered treatment records, medical opinion evidence, and Adam's own testimony and behavior in finding that while Adam has functional limitations, they do not preclude him from working. (R. 21, Govt.'s Resp. at 14.) An ALJ must consider objective medical evidence, daily activities, allegations of pain, aggravating factors, course of treatment, and functional limitations when assessing a claimant's subjective complaints. 20 C.F.R. § 404.1529(c); *see also* SSR 16-3p, 2017 WL 5180304, at *1 (2017). Typically, a court grants deference to the subjective symptom evaluation because an ALJ has the opportunity to observe the claimant testify. *Jones v. Astrue*,

623 F.3d 1155, 1160 (7th Cir. 2010). Nevertheless, an ALJ's "failure to adequately explain his or her credibility finding by discussing specific reasons . . . is grounds for reversal." *Minnick*, 775 F.3d at 937.

The ALJ turned first to Adam's treatment records and found that despite his allegations of "severe and profound functional limitations," the record supported only "mild or moderate" impairments. (A.R. 22.) The ALJ acknowledged that Adam underwent several surgeries before and after his onset date, but explained that his providers "otherwise offered conservative treatment," which helped him control his symptoms. (Id.) Adam objects to the ALJ's reliance on his allegedly "conservative" treatment, arguing that the ALJ "provided no record basis that some other more aggressive treatment was appropriate." (R. 12, Pl.'s Mem. at 14.) But an ALJ may "consider the effectiveness of treatment" when evaluating subjective symptom allegations. *Molnar v. Astrue*, 395 Fed. Appx. 282, 288 (7th Cir. 2010). Also, the ALJ noted that none of Adam's providers indicated that he had "serious ongoing functional deficits." (A.R. 22.) In conducting her symptom assessment, the ALJ was permitted to consider objective medical evidence and course of treatment. *See* 20 C.F.R. § 404.1529(c).

The ALJ next considered medical opinion evidence, which she found supported light work with "some exertional, postural, manipulative, and social limitations." (A.R. 22.) As the government points out, "not a single doctor or treating source that examined [Adam] opined any limitations whatsoever," and all sources who submitted an opinion found Adam capable of performing "at least light work." (R. 21, Govt.'s

17

Resp. at 15 (quoting A.R. 22).) Yet Adam testified that he has significant limitations. (A.R. 70.) He argues that the ALJ was not allowed to rely on the opinions of Drs. Stevens, Lim, or Rana because they were outdated—and that it matters not that no medical opinion supported his subjective allegations. (R. 22, Pl.'s Reply at 7-8.) As explained above, the ALJ had adequate support in the record to rely on the medical opinions of record. And she did not err by considering the extent to which Adam's testimony conflicted with record evidence, including medical opinion evidence. *See Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008) (finding no error in symptom assessment where ALJ "reasonably discounted [claimant's] testimony given the discrepancy between his reports" and medical records); *Schmidt v. Astrue*, 496 F.3d 833, 843-44 (7th Cir. 2007) (finding no error in discounting subjective allegations where the medical record did not support claims).

Finally, the ALJ considered evidence regarding Adam's own statements and behavior. (A.R. 22.) Despite testifying that his ability to sit, stand, and lift are significantly limited, he reported to providers that he did not use a back or knee brace, was not interested in physical therapy, and could walk more than 50 feet unassisted. (Id. at 520, 726, 787, 1036-37.) As for activities of daily living, Adam informed Dr. Ana Gil that he: dresses and grooms himself daily; does his own cooking, cleaning, laundry, and grocery shopping; takes public transportation; watches TV; and pays his bills. (Id. at 511; see also id. at 338-39.) He also traveled to Poland for 18 days in 2015. (Id. at 22; see also id. at 543, 690.) The ALJ appropriately considered Adam's daily activities, combined with all other evidence of record, in evaluating the severity

18

of his alleged symptoms.  *See Alvarado v. Colvin*, 836 F.3d 744, 750 (7th Cir. 2016). In doing so, the ALJ determined that the evidence demonstrated a less restrictive RFC than the one Adam claimed.  (Id.)  Where, as here, the ALJ properly assessed the intensity and limiting effects of Adam's subjective symptoms, the court finds no basis for a remand.

## Conclusion

For the foregoing reasons, Adam's motion for summary judgment is denied and the government's motion is granted.

**ENTER:**

_____
**Young B. Kim**
**United States Magistrate Judge**